# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JUAN IBARRA,               )
                              )
      Plaintiff,         )
                              )
v.                            )     **Case No. 3:05-0971**
                              )     **Judge Trauger**
KENNETH BARRETT, individually )
and in his official capacity, and   )
RUTHERFORD COUNTY,       )
TENNESSEE,                )
                              )
      Defendants.      )

## <u>MEMORANDUM</u>

Pending before the court is the Motion for Summary Judgment filed by the defendants,

Deputy Kenneth Barrett and Rutherford County, Tennessee[1] (Docket No. 34), to which the

plaintiff has responded (Docket No. 44), the defendants have replied (Docket No. 48), and the

plaintiff has filed a sur-reply (Docket No. 51). For the reasons discussed herein, the defendants'

---

[1]In addition to Rutherford County and Deputy Barrett in both his individual and official capacities, the plaintiff seems, at times, to include the Rutherford County Sheriff's Department ("RCSD") among the defendants in this case. (*See* Docket No. 7 ¶ 63 (referring to "Defendant Rutherford County Sheriff['s] Department").) As an initial matter, because "an official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents," naming Deputy Barrett as a defendant in his official capacity adds nothing to this case. *See Jackson v. Henderson*, No. 3:05-0677, 2006 WL 2559523, at *7 (M.D. Tenn. July 18, 2006) (unpublished) (quoting *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000)). Additionally, sheriffs' offices are not "persons" within the meaning of Section 1983. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *Smith v. Williamson County Pub. Defender's Office*, 2007 WL 30894, at *2 (M.D. Tenn. Jan. 4, 2007) (slip op.). As such, only Rutherford County and Deputy Barrett in his individual capacity are properly named as defendants in this case.

1

motion will be granted in part and denied in part.

## FACTUAL BACKGROUND

On November 10, 2004, while driving through Tennessee on his way from Georgia, where he lived, to Missouri, where he worked, the plaintiff passed a patrol car driven by Deputy Kenneth Barrett, who was then a six and one half-year veteran of the Rutherford County Sheriff's Department ("RCSD"). (*See* Docket No. 43 ¶ 7; Docket No. 44 at 1.) Aware that he was speeding, the plaintiff correctly predicted that Deputy Barrett was going to stop him and, accordingly, slowed down, activated his emergency lights, and pulled to the side of the road. (*See* Docket No. 43 ¶ 12.)

Deputy Barrett approached the passenger side of the plaintiff's car and asked him to exit the car. (*See* Docket No. 44 at 1.) During the roadside conversation that ensued, Barrett informed the plaintiff that he was going to issue him a warning because he was speeding. (*See* Docket No. 39-1 at 4.)

Deputy Barrett also inquired of the plaintiff whether he had anything illegal in his car and specifically asked about "any large amounts of cash over $10,000." (*See id.* at 5.) The plaintiff, who had $9,400 in his pocket that he had earned from construction work and planned to use to pay his employees, said that he did not have anything over $10,000, but that he had "maybe $9,000" on his person. (*See id.*) He also assured Deputy Barrett, in response to the deputy's questioning, that he had never been arrested on drug charges. (*See id.*)

The plaintiff then "reluctantly" consented to a search of himself and his car. (*See id.* at 6-7; Docket No. 44 at 2.) Soon thereafter, a dispatcher informed Deputy Barrett that the plaintiff

2

had a criminal history related to charges of selling marijuana in California and that he had been known to use aliases. (*See* Docket No. 39-1 at 8.) Deputy Barrett then questioned the plaintiff once more about his $9,400. (*See id.* at 9.) The plaintiff indicated that he had been saving the money "since last year." (*Id.*)

Lieutenant Chris Haynes of the RCSD, Barrett's supervisor, then arrived on the scene and picked up with Deputy Barrett's line of questioning. (*See id.* at 9-10.) Lieutenant Haynes asked the plaintiff about the drug crime that he had allegedly committed in California. (*See id.* at 10.) The plaintiff protested that he had never been arrested on any drug related charges but stated that he had been charged with "a DUI." (*See id.* at 11.)

The dispatcher confirmed that the plaintiff's criminal history reflected DUI charges and added that the plaintiff's record also revealed charges related to "giving false name and information to the police." (*See id.* at 14.) The dispatcher added that the plaintiff's criminal history showed "two different FBI numbers" and later stated that he had not yet confirmed that the plaintiff was actually the individual who had committed the drug crime in California. (*See id.* at 14, 19.) Deputy Barrett and Lieutenant Haynes secured the plaintiff's consent to search his car. They found no contraband and returned to the plaintiff, who continued to protest any association with the drug charges but acknowledged that he "owe[d] too many money on taxes, that's why [he was] working." (*See id.* at 18-21.)

Deputy Edward Lee Young then arrived with his drug dog and began searching the plaintiff's car once more. (*See* Docket No. 44 at 2.) Lieutenant Haynes continued questioning the plaintiff, now focusing on the source of his money and where he did his banking. (*See* Docket No. 39-1 at 24.) The lieutenant then accused the plaintiff of hiding his money from the

IRS and, therefore, "money laundering." (*See id.* at 25.) At that point, Deputy Barrett began filling out a seizure notice (*see id.* at 27) and, despite never having received confirmation from the dispatcher that the plaintiff was, in fact, the individual convicted of a drug crime in California,[2] seized the plaintiff's money (*see* Docket No. 44 at 4).

The plaintiff and his attorney petitioned the Tennessee Department of Safety in a timely manner for the return of his $9,400. (*See id.*) A seizure hearing took place on May 11, 2005, after which an administrative law judge ("ALJ") ruled that, because "the State failed to establish any relationship between the cash seized from Mr. Ibarra and any illegal drug activity," the RCSD was to return the plaintiff's money to him. (*See* Docket No. 10 ¶¶ 5-6.)

When the plaintiff attempted to retrieve his money from the RCSD, Lieutenant Phillip Martin informed him that he could not get his $9,400 back until the IRS had granted the RCSD permission to release it. (*See* Docket No. 44 at 5.) One month after the ALJ issued his decision, Lieutenant Martin contacted the IRS and was told to put a hold on the plaintiff's money. (*See id.*) The IRS eventually levied the plaintiff's $9,400. No drugs or drug paraphernalia were ever found in the plaintiff's car, and the plaintiff has never been arrested on drug charges in California or any other state.

_____

[2]A review of the criminal report indicates that the name of the individual who was actually convicted of the California crime was Juan Ibarra Bracamontes and that, though the plaintiff and Mr. Bracamontes share the same birthday, they have different physical characteristics, *e.g.*, Mr. Bracamontes is four inches taller than the plaintiff. (*See* Docket No. 44 at 3.)

## ANALYSIS

The plaintiff claims that Deputy Barrett's seizure of his money constituted a violation of his Fourth Amendment and equal protection rights. (*See* Docket No. 7 ¶¶ 52, 56.) Using a variety of vehicles for his claims, he seeks to hold accountable for these violations both Deputy Barrett in his individual capacity and Rutherford County. (*See* Docket No. 44 at 16.) In addition, he asserts a claim for conversion.[3] (*See id.* at 18.)

The defendants now move for summary judgment on each of the plaintiff's claims. (*See* Docket No. 34 at 1.) Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not

---

[3]Although, in his Complaint, the plaintiff also lists claims for intentional and negligent infliction of emotional distress, he concedes in his Memorandum in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment that "[s]ummary judgment is appropriate [as] to these claims." (*See* Docket No. 7 ¶¶ 76-77, 78-81; Docket No. 44 at 18.) Accordingly, the defendants' motion for summary judgment on the plaintiff's emotional distress claims will be granted.

5

to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

**I.    Liability of Deputy Barrett in his individual capacity for alleged violations of the**

6

**Fourth Amendment and the Equal Protection Clause**

In order to prevail on a claim brought pursuant to 42 U.S.C. § 1983 (2000), the plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (internal quotation omitted). The defendants first claim that Deputy Barrett is protected from any Section 1983 liability by the doctrine of qualified immunity. (*See* Docket No. 34 at 4.) This doctrine "shields officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphrey v. Mabry*, No. 05-4462, 2007 WL 957354, at *6 (6th Cir. Apr. 2, 2007) (slip op.) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining whether a law enforcement officer is entitled to qualified immunity, courts employ a two-part analysis that evaluates (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established. *Smoak*, 460 F.3d at 777-78. Throughout the analysis, the burden is on the plaintiff to show that the defendant is not immune from suit. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.").

In conducting this analysis at this stage of the proceedings, the court must first consider whether a genuine issue of material fact exists as to whether the plaintiff's constitutional rights were violated. The plaintiff has asserted violations of both his Fourth Amendment and his equal protection rights. (*See* Docket No. 7 ¶¶ 52, 56.) The court will address the latter of these

7

assertions first.

A.      **Deputy Barrett's alleged violations of the plaintiff's constitutional rights**

1.      **Deputy Barrett's alleged violation of the plaintiff's equal protection rights**

The plaintiff alleges that Deputy Barrett targeted him on the basis of his race or ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment when Barrett seized his money.  *See* U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."); *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) ("The Equal Protection Clause of the Fourteenth Amendment provides citizens with a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."); (Docket No. 7 ¶¶ 55-58).  Specifically, he claims that "[his] property was seized whereas [the property of] similarly situated individuals of a different race certainly would not have been" or, in other words, that he was a victim of selective enforcement.  (*See* Docket No. 7 ¶ 56.)

"Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination.  To address this problem, courts have developed the doctrine of selective enforcement."  *Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 (6th Cir. 1996).  In the Sixth Circuit, selective enforcement claims are governed by the same analysis as selective prosecution claims. *See Farm Labor Organizing Comm. v. Ohio State Highway Patrol*,  308 F.3d 523, 534-35 (6th Cir. 2002).  In *Farm Labor*, the Sixth Circuit noted that "[t]he Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice

8

'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* at 533-34 (quoting *Wayte v. United States,* 470 U.S. 598, 608 (1985)).

Due to the "strong presumption that the state actors have properly discharged their official duties," a plaintiff's burden to demonstrate discriminatory purpose and effect "is a demanding one." *See Gardenhire v. Schubert,* 205 F.3d 303, 319 (6th Cir. 2000) (internal quotation omitted). If a plaintiff satisfies his burden to show both discriminatory purpose and discriminatory effect, the burden shifts to the defendant to demonstrate that "the same enforcement decision would have been made even if the improper purpose or classification had not been considered." *See Farm Labor Organizing Comm.,* 308 F.3d at 539 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977)); *Shahit v. Tosqui*, No. 04-71538, 2005 WL 1345413, at *16 (E.D. Mich. 2005) (unpublished).

To show discriminatory purpose, the plaintiff must demonstrate that the defendant "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte,* 470 U.S. at 610 (internal quotation omitted). Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights*, 429 U.S. at 266. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another." *Farm Labor Organizing Comm.,* 308 F.3d at 534 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

To establish a discriminatory effect in a race case such as this one, the plaintiff must show that similarly situated individuals of a different race were treated differently than he was.

9

*See Farm Labor Organizing Comm.,* 308 F.3d at 534 (internal quotation omitted). A plaintiff may demonstrate discriminatory effect by showing (1) that a similarly situated individual was not investigated; or (2) statistical or other evidence that "address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *See id.* (quoting *Chavez v. Ill. State Police,* 251 F.3d 612, 638 (7th Cir.2001)).

Here, even if the statistical evidence submitted by the plaintiff suffices to create a genuine issue of material fact as to the discriminatory effect of Deputy Barrett's practices, no such issue exists with respect to his alleged discriminatory purpose. (*See* Docket No. 44 at 14-15 (citing statistical evidence that allegedly demonstrates that Deputy Barrett individually, as well as the RCSD as a whole, seized property from Hispanic individuals significantly more often than they did from Caucasian ones).) The Sixth Circuit has found that defendants were acting with a discriminatory purpose when, for instance, they singled out plaintiffs for inquiry into their immigration status based on the plaintiffs' Hispanic appearance. *See Farm Labor Organizing Comm.,* 308 F.3d at 535-36. In *Farm Labor*, the court based its finding, among a number of other factors, on testimony from a state trooper defendant that he called the border patrol only in connection with traffic stops of Hispanic people, not Caucasian people, as well as evidence that the vast majority of the defendant state highway patrol's immigration inquiries concerned Hispanic motorists *See id.* at 535. Similarly, a district court within the Sixth Circuit found the requisite discriminatory purpose where a defendant officer testified that he would not have cited the plaintiffs, all members of the People for the Ethical Treatment of Animals, for criminal trespass had they belonged to a different organization, *e.g.*, the Jehovah's Witnesses or the Boy Scouts. *See Friedrich v. City of Anchorage*, No. Civ.A 3:04-742-H, 2006 WL 897091, at *3

10

(W.D. Ky. March 30, 2006) (slip op.).

In contrast, the Sixth Circuit has found discriminatory purpose lacking where the only evidence of a defendant's racial animus was the plaintiffs' contention that a similarly situated, non-protected individual was treated differently than they were. *See Gardenhire v. Schubert*, 205 F.3d 303, 320 (6th Cir. 2000) ("While such reasoning would be sufficient in establishing a *prima facie* Title VII case, the standard for a selective enforcement claim is much more demanding.").

The plaintiff has not cited–nor has the court's research revealed–any case in which statistical evidence that allegedly showed racial disparity sufficed to evince both discriminatory purpose and discriminatory effect. While the fact that a practice "bears more heavily on one race than another" may be included as part of the "totality of relevant facts" to be used when analyzing discriminatory purpose, such statistics alone are not enough to carry the plaintiff's "demanding burden" as to both of these elements. *See Farm Labor Organizing Comm*., 308 F.3d at 534; *Gardenhire,* 205 F.3d at 319. Indeed, if a plaintiff could satisfy this burden through the use of such statistics standing alone, the "discriminatory intent" element of this analysis would be essentially useless.

In this case, the plaintiff has failed to put forth any evidence of Deputy Barrett's discriminatory purpose. As in *Gardenhire*, in which the Sixth Circuit rejected the plaintiffs' attempt to satisfy both elements of their selective enforcement case by relying on evidence that purportedly showed that a similarly situated, unprotected individual was treated differently than they were, the plaintiff here cannot rely only on statistics alone to meet his burden of demonstrating both discriminatory intent and discriminatory purpose. *See Gardenhire*, 205 F.3d

11

at 820 (noting that the plaintiffs had not presented any evidence to support their claim that the defendant had purposefully discriminated against them).  Accordingly, no genuine issue of material fact exists as to whether Deputy Barrett violated the plaintiff's equal protection rights, and summary judgment will be granted as to this claim.

### 2.    Deputy Barrett's alleged violation of the plaintiff's Fourth Amendment rights

The plaintiff also alleges that Deputy Barrett infringed on his Fourth Amendment rights when he seized his money.  (*See* Docket No. 44 at 6.)   The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV.  Absent valid consent, the government has the duty to establish that a warrantless seizure was justified by probable cause.  *United States v. Baro*, 15 F.3d 563, 567 (6th Cir. 1994) (citing *United States v. Place*, 462 U.S. 696, 701 (1983).  The Sixth Circuit has stressed that probable cause is required to justify the seizure of property carried on one's person, in which "a greater expectation of privacy exists."  *Id.* (internal quotation omitted).  In this context, probable cause "means a reasonable ground for belief that the item seized is contraband or evidence of a crime."  *Id.* at 567-68 (noting that currency is not contraband) (citing *Place*, 462 U.S. at 701; *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Here, the defendants claim that Deputy Barrett's seizure of the plaintiff's money was constitutionally permissible because Deputy Barrett had probable cause to believe that the plaintiff had used or intended to use the money in connection with a violation of the Tennessee Drug Control Act ("TDCA").  (*See* Docket No. 35 at 7 (citing Tenn. Code Ann. § 53-11-

12

451(a)(6) (2005)).)  The TDCA explicitly allows a deputy sheriff to seize money when he has probable cause to believe that the money was used or intended to be used in violation of that Act's provisions.  *See* Tenn. Code Ann. § 53-11-451(b)(4).

As acknowledged by the defendants, Deputy Barrett, at various stages of this dispute, has proffered a number of different bases for his purported probable cause to believe that the plaintiff's money was used or intended to be used in this manner.  (*See* Docket No. 35 at 8.) Five days after he seized the plaintiff's money, Deputy Barrett submitted an "affidavit in support of forfeiture warrant" in which he listed the following facts gleaned during his traffic stop of the plaintiff as the grounds for his probable cause to believe that the money was used or intended to be used in violation of the TDCA: (1) the plaintiff stated that he had over $9,000 on his person and did, in fact, have $9,400; (2) Deputy Barrett's dispatch informed him that the plaintiff had been "arrested for a large amount of marijuana in the past,"; and (3) the plaintiff told Lieutenant Haynes that he owed the IRS $100,000 and, therefore, could not put his money in the bank. (*See* Docket No. 30-4 at 32.)  Deputy Barrett emphasized in this affidavit that he "seized the U.S. currency from Mr. Ibarra due to the fact of his criminal history and that he said he was hiding the money from the IRS."  (*Id.*)

On the same day that he completed his affidavit, Deputy Barrett also wrote a narrative report in conjunction with a "drug asset forfeiture warrant," in which he listed as grounds for probable cause these facts: (1) the plaintiff "appeared to be overly nervous;" (2) the plaintiff stated that he was carrying more than $9,000 and, in fact, had $9,400; (3) the dispatcher advised Deputy Barrett that the plaintiff "had been arrested for felony drug charges in Cal[ifornia]" and that the plaintiff "had several alias[es]"; (4) the plaintiff told Lieutenant Haynes that he owed the

13

IRS $100,000 and, therefore, could not put his money in the bank for fear that the IRS would find out about it; and (5) Deputy Young's drug-sensing dog alerted to the plaintiff's trunk and to a black bag on the back seat of his car.  (*See id.* at 8-9.)

On May 11, 2005, Deputy Barrett testified at an administrative hearing through which the plaintiff sought the return of his money.  (*See* Docket No. 54-1 at 1.)  During this hearing, Deputy Barrett listed his grounds for probable cause as only the following: (1) the fact that the plaintiff allegedly had been arrested for drug charges in California; (2) the fact that the plaintiff was allegedly hiding money from the IRS; (3) the fact that the plaintiff was carrying what was, in Deputy Barrett's view, a large sum of money; and (4) the fact that a drug dog allegedly alerted to the plaintiff's vehicle.  (*See* Docket No. 54-2 at 14-17 (as paginated by the court reporter).)

Deputy Barrett also listed the bases of his purported probable cause in his response to the plaintiff's interrogatories.  (*See* Docket No. 30-3 at 43 (as paginated by the court reporter).) During his deposition, he recounted each of these bases as follows: (1) the plaintiff had a large amount of currency but, in his conversations with Lieutenant Haynes, could not provide proof as to its origin; (2) the plaintiff lied because he said that he had gotten the money from the bank but then later admitted that he had not; (3) someone whose middle name was the same as the plaintiff's last name and who had the same birthday as the plaintiff had been arrested in California for possession of marijuana; (4) Deputy Young told him that the drug dog alerted to a black bag in the plaintiff's vehicle; (5) the plaintiff admitted to Lieutenant Haynes that he was hiding money from the IRS; (6) the plaintiff appeared to be overly nervous; and (7) the plaintiff was known to use aliases.  (*See* Docket No. 30-3 at 43-67.)

Having reviewed these bases and the plaintiff's refutations of them, as well as each

14

party's underlying evidence, the court finds that a genuine issue of material fact exists as to whether Deputy Barrett had probable cause to believe that the plaintiff had used or intended to use his money in connection with a TDCA violation.  For instance, although Deputy Barrett listed the fact that Deputy Young's dog had alerted to various areas of the plaintiff's vehicle as one of his grounds for probable cause (*see* Docket No. 30-4 at 34), he later stated that he himself did not know what the dog did to show an alert but that Deputy Young had informed him that the dog had alerted in this instance (*see* Docket No. 30-3 at 62).  As noted by the plaintiff, however, the video of the traffic stop, which captured everything spoken by Deputy Barrett during the stop, does not reveal any such conversation.  (*See* Docket No. 44 at 9; *see generally* Docket No. 46, Barrett Police Car Video (Nov. 11, 2004) ("Video").)  Similarly, Deputy Young himself testified that he did not tell Deputy Barrett during the traffic stop that his dog had alerted to anything.  (*See* Docket No. 31-3 at 28 (as paginated by the court reporter).)  Deputy Young also noted that, had he told Deputy Barrett about the dog's alert at the scene of the traffic stop, their conversation would have been heard on the video (which it is not).  (*See id.*)

Another one of Deputy Barrett's purported grounds for probable cause was the plaintiff's supposed inability to explain the source of his money and whether he had withdrawn it from a bank.  (*See* Docket No. 30-3 at 43-55.)  Viewing the facts in the light most favorable to the plaintiff, however, it is clear that a reasonable jury could find that his explanations about the money were both truthful and consistent.  The defendants' primary concerns about the plaintiff's explanations stem from the fact that, although the plaintiff said that he got the money from "savings," he could not produce any relevant bank records and, in fact, later admitted that he did not keep his money in a bank. (*See* Docket No. 48 at 3.)  As indicated in the transcript of the

15

video of the traffic stop, the plaintiff did answer "savings" when asked by Lieutenant Haynes "where [he got] the money from." (*See* Docket No. 39-1 at 24.) Significantly, however, the plaintiff never said that he withdrew the money from a savings account at a bank. Rather, the plaintiff has testified that the money was "savings from [his] work" that, as he repeatedly stated during the traffic stop, he had been saving "since last year." (*See id.* at 9; Docket No. 30-2 at 48.)

In addition, although the defendants maintain that the plaintiff's deception was also revealed by his "purporting to look through his billfold for the account number," the plaintiff could very well have had a bank receipt in his wallet. (*See* Docket No. 48 at 3.) As evidenced by one of the defendants' exhibits, the plaintiff may actually have cashed his checks at a bank. (*See* Docket No. 54-3 (indicating that Thomas Openlander of Openlander Construction, for whom the plaintiff worked as a subcontractor, "[m]any times . . . personally went with [the plaintiff] when he cashed his checks").) Particularly given what appears to be a rather significant language barrier between the plaintiff and the officers, the plaintiff's statements about the origin of his money cannot be deemed necessarily deceptive. (*See* Docket No. 43 ¶ 16 (indicating the parties' agreement that the plaintiff "did not understand one hundred percent of what Deputy Barrett was saying"); Docket No. 30-2 at 4 (noting that the plaintiff spoke through a translator during his deposition); Docket No. 54-2 (indicating the ALJ's statement that "[Ibarra] does not speak fluent English").)

The defendants also cite the plaintiff's alleged criminal history as one of the Deputy Barrett's bases for probable cause. During their traffic stop of the plaintiff, Deputy Barrett and, more frequently, Lieutenant Haynes repeatedly accused the plaintiff of having been convicted of

both a drug-related crime and of lying to the police.  (*See, e.g.*, Docket No. 39-1 at 28.)  The plaintiff acknowledges that he has been found guilty of using a false name, and he stated during the traffic stop that he had been convicted for driving while intoxicated.  (*See id.* at 11; Docket No. 43 ¶ 4.)  He repeatedly and vigorously disputed during the traffic stop, however, any connection with a drug crime.  (*See, e.g.*, Docket No. 39-1 at 21.)

The officers became convinced that the plaintiff had been convicted of selling marijuana in California after a dispatcher advised them that someone with the same birth date as the plaintiff whose middle name, like the plaintiff's last name, was "Ibarra" had been arrested nearly ten years earlier while trying to cross the United States border into California carrying 13.2 kilograms of marijuana.  (*See* Docket No. 44 at 3.)  As evidenced by the video transcript, however, the dispatcher explicitly advised the officers that, although the plaintiff's Social Security number matched the one on a DUI conviction, the dispatcher was "still checking on the one out of California, trying to make sure it is going to be the same person."  (*See* Docket No. 39-1 at 19.)  The dispatcher also informed the officers that the criminal history report he was viewing had "two different FBI numbers."  (*See id.* at 14.)  According to the dispatcher's testimony, an individual has only one FBI number and, therefore, the presence of two different FBI numbers on a criminal history report should indicate the presence of two separate individuals.  (*See* Docket No. 31-4 at 21 (as paginated by the court reporter) ("So it would indicate that if they have a different FBI number here, they would be different people, right? Yes, sir, it should.").)

While the officers, upon seizing the plaintiff's money, informed him that his Social Security number matched that on the California conviction, they had actually received no such

confirmation from the dispatcher, nor did they receive any confirmation during the entirety of the traffic stop. (*See* Video at 09:46:04 (revealing that, after Lieutenant Haynes asked "Did it not show that that history in California [sic] his Socials matched up," Deputy Barrett nodded in agreement).) The plaintiff maintains that his Social Security number does not match that of the individual convicted in California, and the defendants do not maintain otherwise. (*See* Docket No. 44 at 8 ("[D]ispatch never confirmed that the [S]ocial [S]ecurity numbers matched the individual in California, and in fact, they did not.").) Had the officers simply waited for an answer from the dispatcher as to whether the plaintiff had been convicted of a drug crime, Deputy Barrett would have discovered that one of his primary sources of probable cause for seizing the plaintiff's money was, in fact, baseless.

Another ground cited by the defendants as grounds for probable cause was the plaintiff's supposedly unusual nervousness during the traffic stop. According to Deputy Barrett, he concluded that the plaintiff was overly nervous because (1) after the plaintiff passed him on the highway, the plaintiff pulled over to the side of the road before Deputy Barrett had activated any of his emergency equipment to stop him; (2) although the plaintiff had rolled down the driver-side window as Deputy Barrett approached him, Deputy Barrett had to tap on the passenger-side window in order to get him to open that one; (3) the plaintiff appeared to be trembling as he handed Deputy Barrett his license; and (4) the plaintiff was "rubbing his chest and stomach" and "pulling at his shirt" as Deputy Barrett questioned him once he had exited his car. (*See* Docket No. 30-3 at 65-67.)

Deputy Barrett asked the plaintiff during the traffic stop why the plaintiff essentially pulled himself over. (*See* Docket No. 39-1 at 4.) As the plaintiff explained, he realized that he

was speeding as he passed Deputy Barrett's police vehicle and thus correctly predicted that he would be pulled over. (*See id.*) A fact-finder presented with this scenario may view the plaintiff's actions as indicative of his lack of anxiety, rather than as evidence that he was overly nervous. In addition, after viewing the video of the traffic stop, the court finds that Deputy Barrett's assertions about the plaintiff's nervousness are undermined by the plaintiff's calm behavior throughout the duration of the traffic stop. Indeed, the video shows the plaintiff smiling as he talks to Deputy Barrett (*see, e.g.*, Video at 09:09:12), passively waiting as Deputy Barrett "runs" his driver's license number (*see, e.g., id.* at 09:05:35), and calmly looking on from a distance as officers repeatedly search his car (*see, e.g., id.* at 09:10:57; 09:29:06).

Thus, Deputy Barrett's only relatively untarnished grounds for probable cause are the fact that the plaintiff was carrying a large amount of money and the plaintiff's own admission that he owed a large sum to the IRS and thus did not keep his money in a bank. (*But see* Docket No. 30-2 at 53 (indicating that the plaintiff was "in the progress of arranging some charges with the IRS and for that reason [he] had the money in cash until the problem could be resolved, and that was the advice or the opinion of [his] accountant").) The Sixth Circuit has labeled as insufficient a number of grounds for probable cause that are much stronger than these.

For instance, in *United States v. $30,000.00 in U.S. Currency*, 30 Fed. App'x 473, 483-84 (6th Cir. 2002), the Sixth Circuit found that a DEA agent did not have probable cause to believe that a traveler's money was evidence of a drug crime, such as would have justified the agent's seizure of it, where the agent seized $30,000 from a man traveling under a false name who revealed that he was carrying that amount of money in his business suit and his sock but could not provide a plausible explanation as to the money's source or intended use. The traveler,

19

whose companion had been arrested on a methamphetamine-related charge, had traveled from a known drug-source city with no luggage on a ticket that had been purchased with cash only twenty-four hours beforehand. *See id.* at 481.

Similarly, in *United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 849 (6th Cir. 1994), the Sixth Circuit found that DEA agents did not have probable cause to believe that money had been furnished or was intended to be furnished in exchange for drugs where the agents seized $9,750 and $5,000, respectively, from two travelers. Among other grounds advanced by the agents as to their probable cause were the fact that (1) the first traveler matched, to some degree, a drug carrier description provided by an anonymous caller; (2) a drug dog alerted to the money; (3) the first traveler lied about the purpose of his trip; and (4) the second traveler had pleaded guilty less than six years before to drug trafficking charges and of "permitting drug abuse." *See id.* In finding a lack of probable cause, the Sixth Circuit specifically noted that "fifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity." *See id.* at 850 (internal quotation omitted). The court also noted that the second traveler's previous drug offenses were "of little import" as "a man's debt to society cannot be of infinite duration." *See id.*

When viewing the case at hand through the lense of these Sixth Circuit cases, the court finds that the defendants have failed to demonstrate the absence of a genuine issue of material fact as to whether Officer Barrett had probable cause to believe that the plaintiff had used or intended to use his money in connection with a TDCA violation. The possibility that the plaintiff's money had been or was going to be used in exchange for drugs was stronger in each Sixth Circuit case described above than it is in this one. For instance, the plaintiff carried

20

substantially less money than the traveler in *$30,000* and was not using a false name.  *See $30,000*, Fed. App'x at 483-84.  He did not lie about the purpose of his trip like the first traveler in *$5,000*, nor did he actually have a criminal history involving drug charges like the second. *See $5000*, 40 F.3d at 849.

Although the plaintiff arguably admitted that he was concealing money from the IRS, which is relevant when establishing a connection between currency and drugs, this fact, along with only the plaintiff's relatively high amount of currency, cannot be enough to create probable cause as to a TDCA violation.  *Cf. United States v. $110,873.00 in U.S. Currency*, 159 Fed. App'x 649, 652 (6th Cir. 2005) (finding that the government had established a connection between drug offenses and the currency it seized where it demonstrated not only that the individual from whom it had seized the money had not filed any state income tax returns between 1994 and 2002, but also that (1) he possessed an unusually large amount of currency ($110,873); (2) drugs were found at the scene of the seizure; (3) a drug dog alerted to the seized money; and (4) the individual had been involved in two other similar incidents in the past).  A finding that evidence of a large amount of currency, when coupled with a failure to pay taxes, is enough to establish probable cause of a connection between the currency and a drug offense would grant an unduly broad license to local law enforcement officers to seize the money of any individual thought to owe a debt to the IRS.

Accordingly, the court finds that a reasonable jury could conclude that Deputy Barrett violated the plaintiff's Fourth Amendment rights when he seized his $9,400.  As such, the court moves to the second prong of the qualified immunity analysis.

21

### B.     Whether the plaintiff's Fourth Amendment rights were clearly established

The Supreme Court has stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

A right is "clearly established" for qualified immunity purposes if there exists "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other districts that is directly on point." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002). Stated differently, a right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Humphrey*, 2007 WL 957354, at *6 (quoting *Saucier*, 533 U.S. at 201). The Sixth Circuit has held that an individual's Fourth Amendment right to be free from unreasonable seizures is clearly established. *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994); *see also Place*, 462 U.S. at 700-01 (recognizing that police officers generally cannot seize property without probable cause); *Pahls v. Kesselring*, No. 99-3647, 2000 WL 1290364, at *2 (6th Cir. Sept. 7, 2000) (unpublished) (noting that individuals whose property was seized "possessed a clearly established right not to have property in which they enjoyed a lawful possessory interest seized by state action in violation of the Constitution").

The plaintiff must also demonstrate, however, that any reasonable officer would have understood that his seizure of the plaintiff's money would violate the Fourth Amendment under the circumstances of this case. *See Humes v. Gilless*, 108 Fed. App'x 266, 269 (6th Cir. 2004).

Based on the information that Deputy Barrett had at the time of the traffic stop, a genuine issue of material fact exists as to whether a reasonable officer would have concluded that probable cause existed so as to justify his seizure of the plaintiff's money. As discussed above, Deputy Barrett's only relatively solid grounds for probable cause to believe that the plaintiff had used or intended to use his money in connection with a TDCA violation were the fact that he was carrying a relatively large sum of money and the fact that he was allegedly attempting to evade his taxes. These facts, viewed in the context of the totality of the traffic stop's circumstances, including among other factors, the dispatcher's indication that he had to wait for confirmation that the plaintiff and the individual convicted of a drug crime in California were one and the same, the plaintiff's repeated denial of any connection to that crime, and the absence of any drugs at the scene, would not create for a reasonable officer the probable cause necessary to justify a seizure of the plaintiff's money. *See Livingston v. Luken*, 151 Fed. App'x 470, 476 (6th Cir. 2005) (noting that, if an officer seized property that did not meet the requirements of the statute that granted him the authority to conduct the seizure, he would violate a clearly established right of which he should have known); *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 310 (6th Cir. 2005) (finding officers' actions to be unsupported by probable cause where the officers "ignored every opportunity to learn more about the suspicious circumstances" while conducting an arrest).

Thus, a genuine issue of material fact exists as to whether Deputy Barrett violated a clearly established right of which a reasonable officer would have known. As such, a reasonable jury could find that he is not entitled to qualified immunity with respect to the plaintiff's Fourth Amendment claims against him. Accordingly, the defendants' motion for summary judgment on

these claims will be denied.

## II.     Liability of Rutherford County for alleged violations of the Fourth Amendment

The plaintiff seeks to hold Rutherford County liable for Deputy Barrett's alleged Fourth Amendment violations via a variety of statutory mechanisms.

### A.     Rutherford County's liability under Section 1983

The plaintiff first employs 42 U.S.C. § 1983 as a vehicle for his claims against Rutherford County. (*See* Docket No. 44 at 16.) While a municipality may be held liable under Section 1983 for a constitutional violation directly attributable to it, that provision does not impose vicarious liability on the municipality for the constitutional wrongs of its employees. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692 (1978); *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir. 1997). As such, the plaintiff may hold the County liable for the Fourth Amendment violations that he allegedly suffered at the hands of Deputy Barrett only if he is able to show that these violations were caused by an unconstitutional "policy" or "custom" of the county.[4] *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480-81 (1986); *Stemler,* 126 F.3d at 865.

Here, the plaintiff seems to claim that two separate customs or policies are responsible

---

[4]As noted above, the defendants have demonstrated that no genuine issue of material fact exists as to whether Deputy Barrett violated the plaintiff's equal protection rights. As such, the plaintiff may not attempt to hold Rutherford County liable for any equal protection violation. *See McQueen v. Beecher Cmty. Schs.,* 433 F.3d 460, 471 (6th Cir. 2006) (noting that a defendant government entity could only be held liable under Section 1983 if its officials had, indeed, violated the plaintiff's constitutional rights).

for the purported infringement of his Fourth Amendment rights.[5]  First, he asserts that the RCSD

"does not provide its employees with any training in forfeiture."  (*See* Docket No. 44 at 17.)

Next, he alleges that the statistical evidence that he employed as part of his equal protection

claim "shows a custom on the part . . . of the [RCSD] to seize property of individuals who are of

the Hispanic race much more often that their White counterparts . . . when no drugs are found in

the individual's possession."  (*See id.*)

The court first will address the plaintiff's failure-to-train claim.  For Rutherford County

to be liable under Section 1983 based upon a failure to train its officers, the plaintiff must prove

that (1) the County's training program is "inadequate to the tasks that officers must perform"; (2)

the inadequacy is the result of the county's deliberate indifference; and (3) the inadequacy is

"closely related to" or "actually caused" the plaintiff's injuries.  *See Hill v. McIntyre*, 884 F.2d

271, 275 (6th Cir. 1989) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Because the court finds that the plaintiff has not met his burden to demonstrate any

deliberate indifference on the part of the County, it need not address this test's other elements.

In *City of Canton*, 489 U.S. at 379, the Supreme Court emphasized that "[o]nly where a failure to

train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly

thought of as an actionable city 'policy.'"  In order to demonstrate that Rutherford County's

alleged failure to provide forfeiture training to its officers amounted to deliberate indifference,

---

[5]The plaintiff, in his Complaint, puts forth separate claims of "custom or usage," "deliberate indifference," and "failure to train, supervise, discipline, screen or hire" and then, in his Memorandum in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment, appears to link at least some of these claims together.  (*Compare* Docket No. 7 at 6-7 (stating each claim separately) *with* Docket No. 44 at 19 (linking "custom or usage" with "failure to train").)  These "claims" form the components of a single analysis and are thus properly discussed together.

25

the plaintiff must show "prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *See Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Stemler*, 126 F.3d at 865 ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (internal quotation omitted). The plaintiff has not put forth a single instance of prior unconstitutional conduct that would have put the County on notice that its forfeiture training was in some way inadequate. As such, the plaintiff cannot use a failure-to-train theory to hold the County liable for Deputy Barrett's alleged Fourth Amendment violations.

The plaintiff's assertion about Rutherford County's purported custom of seizing property from Hispanic individuals more often than from Caucasian ones is also missing an important element. To hold the County liable for this purported custom, the plaintiff must show that the custom caused the deprivation of his constitutionally protected right. *Monell*, 436 U.S. at 690-91. So as to avoid the *respondeat superior* liability cautioned against in *Monell*, a court must ask whether a "direct causal link" exists between the purported custom and the alleged constitutional deprivation. *See City of Canton, Ohio*, 489 U.S. at 385) (noting that whether a direct causal link exists should be the "first inquiry in any case alleging municipal liability under [Section] 1983").

A "custom," for the purposes of *Monell* liability, must be "so permanent and well settled as to constitute a custom or usage with the force of law." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). The notion of "law" itself must include "deeply embedded traditional ways of carrying out state policy." *Id.* at 507-08 (citing

26

*Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).  Described by the Sixth Circuit as "a legal institution not memorialized by written law," a custom must reflect a course of action deliberately chosen from among various alternatives.  *Id.* (internal quotations and citations omitted).

Here, the plaintiff has failed to even assert that the custom about which he is complaining somehow caused Officer Barrett's allegedly unconstitutional conduct.  Even if the County does, in fact, have an unconstitutional custom of seizing money from Hispanic individuals more often than from Caucasian ones, the plaintiff has not met his burden to show that this custom caused Officer Barrett's actions in this case.  Accordingly, his attempts to hold Rutherford County liable for Officer Barrett's allegedly unconstitutional seizure based on the County's purported improper custom must fail.  *See Doe*, 103 F.3d at 507 (noting that the plaintiff carries the burden of establishing causation in this type of case).  As such, the defendants' motion for summary judgment as to Rutherford County's Section 1983 liability for Deputy Barrett's actions will be granted.

### B.      Rutherford County's liability under Sections 1985 and 1986

Next, the plaintiff asserts that Rutherford County violated 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986 when it "conspired to deprive [him] of his constitutionally guaranteed rights" and "refused to prevent or aid in preventing the commissions of the constitutional violations complained of [by him]."  (*See* Docket No. 44 at 17; Docket No. 7 ¶¶ 70, 73.)

To maintain a cause of action under Section 1985, a plaintiff must establish the following four elements: "(1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly,

any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003) (quoting *United Bhd. of Carpenters & Joiners Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)).

By its very nature, a conspiracy requires that two or more persons or entities conspire. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991). The intra-corporate conspiracy doctrine provides, however, that employees of one governmental agency cannot conspire among themselves because they are treated as a single entity. *Id.* (citing *Dougherty v. Am. Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984)). Courts within the Sixth Circuit have applied this doctrine in the context of police officers and the municipalities for which they work. *See, e.g., Taylor v. Nichols*, No. 05-1201-T-AN, 2006 WL 3725136, at *1 (W.D. Tenn. Dec. 15, 2006) (unpublished) (finding that a city and a number of police officers employed by that city could not be liable under Section 1985(3) where the officers had acted in their official capacities because "the individual defendants were all employees of the same collective entity, [and thus the p]laintiff cannot establish the necessary element of two or more persons to form a conspiracy"); *Norfleet v. City of Memphis*, No. 05-CV-02452-D/V, 2005 WL 2600218, at *3 (W.D. Tenn. Oct. 12, 2005) (unpublished) (noting that the defendants, a city and a number of police officers employed by that city, "cannot be liable under [Section] 1985(3) since a conspiracy requires two or more persons" and indicating that the city and the officers "comprise one entity or person, since the officers as employees of the [c]ity were acting in the scope of their employment . . . ") (internal quotation omitted).

28

Here, the plaintiff alleges that various employees of the RCSD, including Lieutenant Martin, Lieutenant Haynes, and possibly Deputy Barrett, conspired to deprive the plaintiff of his equal protection rights.  (*See* Docket No. 44 at 18.)  Although the Sixth Circuit has recognized "an exception to the intra-corporate conspiracy doctrine under which liability can be imposed upon employees acting outside the scope of their employment relationship," here the plaintiff has not alleged that any of these individuals–two of whom are not even named as defendants–acted outside the scope of their employment with the County.  *See Miller v. City of Columbus*, No. 2:05-CV-425, 2007 WL 915180, at *15 (S.D. Ohio March 26, 2007) (slip op.) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 841 (6th Cir. 1994) (recognizing the exception)). Accordingly, although neither party discussed the applicability of the intra-corporate conspiracy doctrine to this case, the plaintiff's Section 1985(3) claim against the officers fails on these grounds.

In addition, the Sixth Circuit has indicated that "[c]ourts have traditionally viewed conspiracy suits against public officials with suspicion and disfavor" and that "[a]ccordingly, pleading requirements governing civil conspiracies are relatively strict."  *Fisher v. City of Detroit*, No. 92-1759, 1993 WL 344261, at *5 (6th Cir. Sept. 9, 1993) (unpublished).  Here, the plaintiff, in his cursory discussion of his Section 1985(3) claim, not only fails to state with specificity the material facts that support each of the elements of this claim, but fails to even mention the elements at all.  Indeed, to take just one element as an example, the plaintiff does not set forth any facts that give rise to an inference that there was a "meeting of the minds" or any express or implied agreement among the officers to deprive the plaintiff of his rights.  *See Leisure v. Franklin County Court of Common Pleas*, No. 2:05-CV-1123, 2006 WL 1281764, at

*4 (S.D. Ohio May 8, 2006) (slip op.) (dismissing a plaintiff's Section 1985(3) claims where she failed to allege facts that gave rise to an inference of a "meeting of the minds" among the defendants). As such, the defendants' motion for summary judgment on the plaintiff's Section 1985(3) claim will be granted.

Similarly, the plaintiff cannot maintain an action under Section 1986 because that provision only provides a cause of action against any person who neglects to prevent the conspiracies described in Section 1985. *See Willing v. Lake Orion Cmty. Schs. Bd. of Trustees*, 924 F. Supp. 815, 819 (E.D. Mich. 1996). The existence of a conspiracy actionable under Section 1985 is, therefore, "an indispensable prerequisite to a [S]ection 1986 claim." *Id.* Without a demonstration of such a conspiracy, a Section 1986 claim will fail. *See Azar v. Conley*, 456 F.2d 1382, 1385 n.2 (6th Cir. 1972) ("The failure to state a claim under [Section] 1985 rules out the applicability of [Section] 1986."). Such is the case here. Accordingly, the defendants' motion for summary judgment on this claim will also be granted.

## III.     Liability of Rutherford County for conversion

Finally, the plaintiff claims that the defendants wrongfully converted the $9,400 they seized from him. (*See* Docket No. 7 ¶ 86.) Although he refers to "defendants" in the section of his Complaint that addresses this claim, he appears to bring this claim against only Rutherford County. (*See id.*; Docket No. 44 at 18 ("[T]he County remains liable on Plaintiff's state law claims for conversion.").) The defendants maintain, however, both that Rutherford County is immune from liability for conversion and that the plaintiff is unable to establish the elements of conversion with respect to his claims against Deputy Barrett. (*See* Docket No. 35 at 18.)

30

In Tennessee, a plaintiff may establish a *prima facie* case of conversion, which is an intentional tort, by demonstrating the following elements: (1) the appropriation of the plaintiff's property to another individual's own use and benefit; (2) by the intentional exercise of dominion over the property; (3) in defiance of the plaintiff's rights. *See River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 60 (Tenn. Ct. App. 2002).

The court need not entangle itself in the immunity issues surrounding this claim nor spend time attempting to ascertain against which parties the plaintiff intended to assert this action, because the plaintiff has failed to lay out the claim's basic elements with respect to both the County and Deputy Barrett. In particular, the plaintiff has not indicated any way in which either defendant appropriated the plaintiff's money to that defendant's own use and benefit. *See Ivey v. Hamlin*, No. M2001-01310-COA-R3-CV, 2002 WL 1254444, at *4 (Tenn. Ct. App. 2002) (unpublished) (finding that summary judgment should have been granted against a plaintiff claiming conversion where the plaintiff had not demonstrated that the deputy sheriff who seized the plaintiff's property had appropriated the property to his own use).

In order to survive a motion for summary judgment on his conversion claim, the plaintiff must make a sufficient showing as to each of the claim's elements. *See Williams*, 187 F.3d at 537-38. If evidence of the defendants' use and benefit of the plaintiff's money, in fact, exists, it is the plaintiff's obligation to bring this information to the attention of the court. *Nguyen v. Michigan*, No. 92-1657, 1993 WL 281462, at *3 (6th Cir. July 27, 1993) (unpublished) ("This court will not conjure up facts necessary to turn a frivolous claim into a substantiated one . . . [W]hen a Complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist."). The plaintiff has failed to indicate any way in

31

which the defendants appropriated his money to their own use and benefit. As such, the
defendants' motion for summary judgment on this claim will be granted.

## CONCLUSION

Genuine issues of material fact exist as to (1) whether Deputy Barrett violated the
plaintiff's Fourth Amendment rights when he seized his money; and (2) whether Deputy Barrett
is entitled to qualified immunity with respect to this claim. The defendants have, however,
demonstrated that no reasonable jury could find for the plaintiff with respect to the rest of his
claims. Accordingly, summary judgment will be granted in part and denied in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge